UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| LINCOLN FINANCIAL ADVISORS CORP., | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | CAUSE NO. 1:09-CV-15RM |
| SAGEPOINT FINANCIAL INC., f/k/a AIG FINANCIAL ADVISERS, INC., | ) ) ) | |
| Defendant | ) ) | |

OPINION AND ORDER

This cause came before the court for hearing on Lincoln Financial Advisors'
motion for preliminary injunction to prevent the defendant from using its newly
adopted business name, SagePoint Financial, Inc. The complaint is filed under the
Lanham Act, 15 U.S.C. §§ 1116 and 1125(a). This court has jurisdiction under 28
U.S.C. § 1331. For the reasons that follow, the court denies Lincoln's motion.


I

The name "AIG" lost its marketing cachet in 2008.

In September 2008, AIG Financial Advisors, Inc. decided to change its name
and hired a name consultant, submitted its proposed name to a financial
regulatory body, and asked outside trademark counsel for a legal opinion. In
January 2009, the defendant changed its name from AIG Financial Advisors, Inc.
to SagePoint Financial, Inc. and filed an intent-to-use application for "SagePoint"
in the U.S. Patent and Trademark Office. SagePoint Financial is now an AIG

subsidiary incorporated in Delaware with its principal place of business in Phoenix, Arizona.

Lincoln Financial is a broker-dealer and registered investment advisor. Sagemark Consulting is the marketing name — "boutique brand," as a Lincoln witness described it — for a division of Lincoln's financial advisors. Lincoln began using the Sagemark Consulting mark in connection with business Lincoln obtained through acquisition of CIGNA Financial Advisors in 1998. Lincoln uses Sagemark Consulting to brand and segment services provided by advisors who choose to use the mark that way. Sagemark Consulting produces financial plans, not financial products. Lincoln sold more than $55 million worth of financial products and services under its Sagemark Consulting mark in 2000, followed by $51 million in 2001, $50 million in 2002, $51 million in 2003, $58 million in 2004, $124 million in 2005, $126 million in 2006, $142 million in 2007, and more than $125 million in 2008.

Lincoln maintains some twenty-five Sagemark Consulting field offices throughout the United States. Five-hundred financial advisers now offer Lincoln products under the Sagemark Consulting name. That figure has grown from 300 since 2004. The Sagemark Consulting advisors don't gather at the altar of transparency: some use the Lincoln Financial name as well as Sagemark Consulting. Financial advisors associated with Sagemark Consulting use business cards and letterhead with the Sagemark Consulting mark, adding (as the law requires) its association with Lincoln. One who accesses the website on that

business card is redirected to the Lincoln Financial home page, where the Sagemark Consulting logo flashes in the upper left corner and in the footer. Clicking on that logo continues the discussion of Lincoln Financial, without discussion of Sagemark Consulting. The same is true of Lincoln's financial planning Web page, products page, and online services page. Lincoln reports that it planned to make greater use of the Sagemark Consulting mark this year, but the preliminary injunction record contains few specifics about what steps had been taken or what the plans entailed.

Lincoln has spent $500,000 per year promoting Sagemark Consulting since 2004. Lincoln has used the mark since 1998, primarily through brochures for financial advisors (who may provide them to end consumers), limited advertising on the Internet, and signs posted in its field offices in twenty-five locations throughout the country. Lincoln also claims success in developing and maintaining substantial business in connection with the "Sagemark Consulting" mark, which Lincoln says is well-known in the industry. The brochures provided to financial consultants identify the actual products as Lincoln Financial products. Lincoln spreads its name primarily through referrals.

Lincoln says SagePoint Financial competes directly with Lincoln in terms of both clients and financial professionals, and that both companies provide the same sort of investment services, using similar marketing tools. SagePoint Financial sells its products through independent financial advisors who are located in forty-nine states. SagePoint Financial doesn't sell its products directly

to end consumers, and most of its affiliated advisors do business under their own respective company names.

SagePoint Financial has no financial product of its own; it sells a variety of financial products, such as mutual funds, annuities, life insurance, stocks and bonds, direct investments, traditional insurance and options. SagePoint Financial manages $28 billion (a figure that was much higher in early 2008). Nearly all of its 2,500 advisors are independent contractors, very few of whom use the SagePoint Financial name. SagePoint Financial doesn't advertise to consumers. The end consumer often is unaware who SagePoint Financial is. The audience for its Website is a potential investment adviser. There is no place for a retail consumer to log into the Website. An investor cannot obtain account information directly through SagePoint Financial. SagePoint Financial advisors say they offer securities through SagePoint Financial, a broker-dealer.

On January 23, Lincoln filed its complaint and sent the defendant a cease and desist letter asking it to refrain from using the "SagePoint" mark and name because it would cause confusion with Lincoln's "Sagemark" name. SagePoint has since completed its name change, changing its website and activating a new website that features SagePoint Financial instead of AIGFA.

Additional facts are set forth as pertinent.


II

To prevail on its preliminary injunction motion, Lincoln Financial must show: (1) a reasonable likelihood of success on the merits, (2) that it is suffering irreparable harm that outweighs any harm the defendants will suffer if the injunction is granted, (3) there is no adequate remedy at law, and (4) an injunction would not harm the public interest. Christian Legal Society v. Walker, 453 F.3d 853, 859 (7th Cir. 2006); *see also* Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365, 374 (2008). If Lincoln Financial makes such a showing, the court must "weig[h] the factors against one another in a sliding scale analysis . . . to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied." Christian Legal Society v. Walker, 453 F.3d at 859; Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir. 2002).

Lincoln says confusion between its mark and the defendant's name poses "inestimable risks of business loss," and so seeks to enjoin SagePoint from using "SagePoint Financial" or any other confusingly similar variations pending resolution on the merits. Lincoln argues that its likely to succeed on the merits of its claim because it can establish the existence of both a protectable mark and a likelihood of confusion between that mark and the SagePoint name. Lincoln says "Sagemark Consulting" is a suggestive, rather than descriptive, mark, and secondary evidence establishes that the Sagemark name is protectable, such as Lincoln's use of the name for more than ten years — established that the Sagemark name is protectible.

Lincoln claims there is a likelihood of confusion between "Sagemark Consulting" and "SagePoint Financial" because of the names' similarity and the similarity of the services the two companies provide. Lincoln says the parties provide their services in the same area and manner: marketing to the general public and financial advisors nationwide, using a network of service professionals, branch/field offices, and Internet websites. Lincoln argues that consumers seeking financial services are likely to exercise a relatively low degree of care regarding the players in the industry and may be confused by AIGFA's name change. Lincoln notes two incidents of alleged actual confusion that have occurred since AIGFA changed its name and argues that AIGFA chose a similar name despite awareness of Lincoln's mark, supporting an inference of intent to trade upon Lincoln's goodwill.

Lincoln argues that SagePoint's continued infringement will cause irreparable harm to its goodwill and reputation. Lincoln says it faces harm to its business by unfair competition as well as risk to its good name both from its inability to control the quality of SagePoint's services and perceived connection between Lincoln and AIG. Lincoln claims the favor of the balance of hardships because SagePoint changed its name only recently and could continue providing services under its earlier name at the same volume. Finally, Lincoln says protecting against consumer confusion and unfair competition fosters the public interest.

SagePoint Financial argues that Lincoln is unlikely to succeed in showing a likelihood of confusion between "Sagemark Consulting" and "SagePoint Financial." SagePoint Financial points out that Lincoln's application to register "Sagemark Consulting" was refused on likelihood of confusion grounds. Lincoln chose to use the mark nonetheless, but SagePoint Financial says Lincoln's marketing materials prominently display the Lincoln Financial mark, not the Sagemark Consulting name. Thus, SagePoint Financial argues, the Sagemark Consulting mark is weak because it's virtually unknown and not heavily promoted in the industry. SagePoint Financial presented evidence of third-party usage of the term "Sage" in marks and names for financial services, including seven federal registrations for marks consisting of or containing "sage" and covering financial services. SagePoint Financial also contends that "Sagemark Consulting" doesn't appear in trade publications and isn't visible because Lincoln doesn't engage in television, radio, or consumer print advertising under the mark. SagePoint Financial says Lincoln hasn't shown how prevalently it has used the mark or that its consumers recognize the mark.

SagePoint Financial also claims that Sagemark Consulting and SagePoint Financial differ in sight, sound, and meaning, and that participants in the financial community commonly use the word "sage" for similar and even identical services. SagePoint Financial notes that Lincoln uses the "Sagemark Consulting" in a red logo format with "a member of Lincoln Financial Group" always following it, while SagePoint Financial uses a different layout in terms of font, capitalization,

layout, coloring, and overall stylization. SagePoint Financial contends that SagePoint conveys "the convergence of wise counsel and strong relationship," while Sagemark conveys no such meaning. SagePoint Financial says that while its services are similar to Lincoln's, it promotes those services quite differently: Lincoln promotes its "Sagemark Consulting" division in close connection with the "Lincoln" name, while SagePoint Financial markets its products to other financial companies who, in turn, market to end consumers. Because SagePoint Financial's end consumers typically deal with advisors using different names, SagePoint Financial argues, there is a lessened likelihood of confusion.

SagePoint Financial says the parties' financial advisors are talented and experienced professionals, and its end consumers are wealthy families and executives, business owners, and affluent retirees. Likelihood of confusion can't be presumed, SagePoint Financial says, because consumers exercise heightened care in selecting banking and financial services. SagePoint Financial denies any intent to palm off Lincoln, which has recently experienced its own serious financial setbacks. SagePoint Financial paid a consultant more than $570,000 to help develop its new name — a process that took three months. SagePoint Financial obtained an opinion from outside counsel, filed an application with FINRA, filed a trademark application, and registered its new name in all fifty states.

SagePoint Financial says the balance of harms weighs in its favor. An injunction will cost SagePoint Financial significant money, credibility, stability,

reputation, and the confidence of its affiliated financial advisors and end consumers. SagePoint Financial estimates that it would lose no less than 250 financial advisors, who would terminate their affiliation in the event of a name change, producing losses of more than $25 million. SagePoint Financial believes the public interest dictates against interfering with its name because Lincoln hasn't shown that consumers are familiar with its mark or that those consumers need immediate protection from any alleged likelihood of confusion.

## A

The threshold consideration in any preliminary injunction hearing is the movant's likelihood of success on the merits of the underlying claim. Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 726 (7th Cir. 1998). The movant need not show probable victory; a likelihood of success exists if the moving party shows that it has a "better than negligible" chance of succeeding on its claim. Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1114 (7th Cir. 1997); *see also* Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001); Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043 (7th Cir. 2000).

The Lanham Act protects registered and unregistered marks from interference by state legislation, prevents unfair competition, and protects against fraud by use of reproductions, copies, counterfeits, or colorable imitations of registered marks. Packman v. Chicago Tribune Co., 267 F.3d 628, 638 (7th Cir.

2001); 15 U.S.C. § 1125(a). To prevail on its claim that the defendant violated Section 43(a) of the Lanham Act, Lincoln will have to establish that (1) the name "Sagemark Consulting" is a protectable mark, and (2) use of the name "SagePoint Financial" is likely to cause confusion among customers. Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d at 812. A mark's validity "pertains to whether a 'word, term, name, symbol or device,' 15 U.S.C. § 1125(a)(1), is entitled to protection under trademark law by focusing on whether that mark specifically identifies and distinguishes one company's goods or services from those of its competitors. The infringement of a mark concerns whether the actions of a subsequent user of a substantially similar or identical mark causes a likelihood of confusion among consumers as to the source of those specific goods or services." Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d at 727.

One may acquire a protectable right in a trademark only through use of the mark in connection with its product. Johnny Blastoff, Inc. v. Los Angeles Rams Football, Co., 188 F.3d 427, 433 (7th Cir. 1999). One seeking to establish appropriation of a trademark must show "first, adoption, and second, the use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." Id. at 433-434 (citation omitted). "The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it." Id. at 434. "For the purpose of establishing public identification of a mark with a product or service, the fact-finder may rely on the use of the mark in

'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications.'" Id. (citing T.A.B. Sys. v. Pactel Teletrac., 77 F.3d 1372, 1375 (Fed. Cir. 1996)).

Marks are classified into five categories of increasing distinctiveness: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-765 (1992). A generic term is one that doesn't identify any particular service, and a descriptive term is one that describes the qualities or characteristics of a particular good or service. Custom Vehicles, Inc. v. Forest River, Inc., 476 F.3d 481, 483 (7th Cir. 2007). Generic and descriptive terms ordinarily don't function as trademarks, but a descriptive mark may warrant protection if that mark has acquired secondary meaning, i.e., it has become uniquely associated with the original seller. Id. Suggestive marks, on the other hand, suggest some characteristic of the goods or services to which it's applied and requires the consumer to exercise imagination and perception to determine the nature of the goods or services. See G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 992 (7th Cir. 1989). Suggestive marks are protected without proof of secondary meaning. Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 991 (7th Cir. 2004). Finally, an arbitrary or fanciful mark bears no relationship to the product or service with which it is associated. Serv. Merchandise Co. v. Serv. Jewelry Stores, Inc., 737 F. Supp. 983, 992 (S.D. Tex. 1990).

"Sagemark Consulting" isn't a registered trademark. Lincoln argues that the mark is protectable because it's suggestive and/or arbitrary and, even if only descriptive, has a secondary meaning due to its continuous and exclusive use. Lincoln claims that "Sagemark Consulting" is a protectable mark based on public and exclusive use of the name for ten years in marketing its services.

The name isn't descriptive because it doesn't describe the financial services Lincoln provides. Applying the "degree of imagination test," Lincoln's mark appears to be suggestive because it doesn't impart information directly, but instead stands for an idea that requires some operation of the imagination to connect it with the services at issue. Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc., 149 F.3d at 727 (citing Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992)). For example, "Sagemark Consulting" identifies the source of Lincoln's services and doesn't merely describe the quality of those services like the term "platinum" in the name "Platinum Mortgage." Platinum Home Mortgage v. Platinum Fin. Group, 149 F.3d at 728.

Lincoln presented only modest evidence that "Sagemark Consulting" has developed secondary meaning as applied to Lincoln's financial services, consisting of the length of use and a February 2009 magazine reference. A court may consider several factors to determine whether secondary meaning has been established, including: 1) the amount and manner of advertising; 2) the sales volume; 3) the length and manner of use; 4) consumer testimony; and 5) consumer surveys. Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d

1079, 1085 (7th Cir. 1988); *see also* <u>Simon Prop. Group, L.P., v. mySimon, Inc.</u>, 2001 Wl 66408, *3 (S.D. Ind. Jan. 24, 2001). Lincoln argues that its mark acquired secondary meaning because Lincoln has used it so long and exclusively in the financial services industry, but Lincoln submitted no consumer testimony or surveys to support this assertion. Accordingly, Lincoln has made only a slight showing that consumers associate its "Sagemark Consulting" mark with its services. This inquiry isn't fatal to Lincoln's request because the mark arguably is suggestive. Regardless, SagePoint Financial doesn't contest that "Sagemark Consulting" is a protectable mark but, rather, argues that there is no likelihood of confusion between the name and "SagePoint Financial."

## B

Seven factors guide evaluation of the likelihood of confusion: 1) the marks' similarity in appearance and suggestion; 2) the products' similarity; 3) the area and manner of concurrent use; 4) the degree of care consumers are likely to exercise; 5) the strength of complainant's mark; 6) actual confusion; and 7) the defendant's intent to "palm off his product as that of another." <u>Smith Fiberglass Prods., Inc. v. Ameron, Inc.</u>, 7 F.3d 1327, 1329 (7th Cir. 1993). None of these factors is dispositive considered alone; instead, the weight given to each depends on the case. *See* <u>Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F.3d at 1115. "[T]he similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance," but there is no requirement that all three

of these factors weigh in the plaintiff's favor before an injunction may be issued. Promatek Indus. v. Equitrac Corp., 300 F.3d at 812; Ty, Inc. v. Jones Group, Inc., 237 F.3d at 902.

1

Trademarks are confusingly similar if they are similar in sound, appearance, meaning, or connotation. CFM Majestic, Inc. v. NHC, Inc., 93 F. Supp. 2d 942, 951 (N.D. Ind. 2000). In deciding whether two marks are similar, comparison is made "in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." Meridian Mut. Ins. v. Meridian Ins. Group, 128 F.3d at 1115; *see also* AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 825 (7th Cir. 2002).

Both marks begin with the word "sage." "[I]f one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements," Ty, Inc. v. Jones Group, Inc., 237 F.3d at 898 (*citing* Henri's Food Prods. Co., Inc. v. Kraft, Inc., 717 F.2d 352, 356 (7th Cir. 1983)), so the court begins with whether the word "sage" is the salient portion of the "Sagemark Consulting" mark. Unlike (for example) the word "Beanie" in the mark "Beanie Baby," Lincoln hasn't shown that "sage" is a well-known and famous part of its mark. *See* Ty, Inc. v. Jones Group, Inc., 237 F.3d at 899; *see also* CFM Majestic, Inc. v. NHC, Inc., 93 F. Supp. 2d at 951 (concluding that the dominant term for both parties' marks was the word "Vermont" because it had achieved such familiarity among the consuming public that the product was

14

sometimes simply referred to in the marketplace by its dominant first name). Accordingly, the court considers the two marks as a whole.

Lincoln points out that the first portion of each mark is identical, and "Sagemark" and "SagePoint" have the same number of syllables, but the marks have distinctive hang tags that make them seem dissimilar. The two marks sound different and have different meanings. Lincoln's own argument to the Trademark Office — that there was no likely confusion between "Sagemark Consulting" and "Sage Corporate Bond Fund" because the common denominator, "sage," was unlikely to cause confusion to the reasonable purchaser of investment services — bolsters this reasoning. *See* Top Tobacco, L.P. v. N. Atl. Operating Co., 2007 WL 118527, at *4 (N.D. Ill. Jan. 4, 2007) (finding that plaintiff's concessions before the Trademark Office that the mark "top" for tobacco was common belied plaintiff's arguments in support of a preliminary injunction that "top" was a strong mark).

The parties' logos differ in terms of fonts, capitalization, layout, coloring, and design elements. The "Sagemark Consulting" logo is red and regularly followed by the phrase "A member of Lincoln Financial Group." These surrounding characteristics may enable consumers to distinguish more easily between the two marks. *See* Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d at 1044 (holding that although the marks "SMOKE DADDY" and "BONE DADDY" are similar in appearance and suggestion, their distinct visual presentations significantly undercut the strength of the plaintiff's argument that the marks are likely to be confused); *see also* Packman v. Chicago Tribune Co., 267 F.3d at 644 ("Different

packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion."). No other national broker dealer uses green and grey in its logo, like SagePoint Financial does. The overall commercial impression reveals that the similarities between the two marks are outweighed by the differences such that consumers aren't likely to confuse one for the other. This element favors SagePoint Financial.

2

In considering whether products are closely related for the purpose of likelihood of confusion, "[a] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Sullivan v. CBS Corp., 385 F.3d 772, 778 (7th Cir. 2004).

SagePoint doesn't consider Lincoln to be a competitor because they haven't recruited advisors from each other. The court disagrees: Lincoln and SagePoint Financial are direct competitors. Both are broker dealers (Sagemark Consulting isn't a broker-dealer, but Lincoln is), both have RAA services, both have national marketing footprints, and both distribute through a national sales force to the same target market. Both are listed among the nation's top independent broker dealers. Lincoln and SagePoint Financial sell very similar, if not identical, financial services, using the same marketing channels. The parties compete directly for the same customers and talent. This element favors Lincoln.

3

The court also considers whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir. 1990). Important factors include: the relative geographical distribution areas, whether there is direct competition between the products, whether the products are sold to consumers in the same type of store, whether the products are sold in similar sections of a particular store, and whether the product is sold through the same marketing channels. Ty, Inc. v. Jones Group, Inc., 237 F.3d at 900.

Lincoln and SagePoint Financial both provide and market broker-dealer and registered investment advisory related services on a national basis through a network of financial advisors. Both parties market to the general public and to experienced financial advisors using similar marketing tools, such as field offices, service professionals, and Internet websites. SagePoint Financial argues that the parties promote their services differently: Sagemark Consulting is marketed closely with the Lincoln name, while SagePoint Financial markets exclusively to other financial companies, who, in turn, market to end consumers. That distinction is unpersuasive. While SagePoint Financial may not have direct contact with its end consumers, both companies mass market to a wide set of sophisticated advisors. As such, the possibility exists that the parties target the same consumers. This factor weighs in favor of Lincoln.

4

The parties disagree as to whether their consumers are likely to exercise a high degree of care in evaluating their financial services. Lincoln says people seeking financial advisory services tend to do so because they lack the time and expertise to do so themselves, and so are likely to exercise a relatively low degree of care in selecting financial services. Lincoln believes these consumers are more likely to follow news with respect to recent failures in the market and may be more confused by the defendant's name change than other members of the public. SagePoint Financial argues that the relevant market consists of sophisticated buyers and experienced financial advisors who are likely to exercise a great deal of care in selecting financial services.

Lincoln believes investors exercise great care in choosing the financial advisor with whom they do business, but not the company the advisor represents. A professional advisor would not be confused by the time the advisor signs with a broker dealer, though there is some chance that a broker dealer might be confused at the outset of discussions. If a financial advisor leaves one broker dealer for another, it is expected within the industry that the investor will follow the advisor. Accordingly, in this industry, the salesperson is as much the broker dealer's target market as the investor (indeed, perhaps more so), and the risk of confusion of the advisor is slight.

Lincoln's primary consumer target consists of affluent people with the wherewithal to purchase financial services, but less affluent people have invested with Lincoln as well. One would expect that individuals and businesses seeking

to invest their money would have a higher sophistication level and would exercise greater care in selecting a service. *See* Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1217 (7th Cir. 1997) (noting that confusion is less likely where consumers are sophisticated and deliberative buyers). "The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." Best Vacuum, Inc. v. Ian Design, Inc., 2005 WL 1185817, *10 (N.D. Ill. Jan. 18, 2005) (*citing* CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 683 (7th Cir. 2001)). Because the consumers in question are wealthier individuals and businesses seeking to invest their savings, they will exercise more care in picking an investment service. This factor tends to favor SagePoint Financial.

## 5

A trademark's strength refers to the mark's distinctiveness — its propensity to identify the products or services sold as emanating from a particular source. *See* Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 454 (7th Cir. 2000); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d at 959. Lincoln contends that its "Sagemark Consulting" mark is strong because it has been used nationwide for more than ten years to sell millions of dollars of financial services.

SagePoint Financial contends that the "Sagemark Consulting" mark is weak because third-party use of the term "sage" in marks and names for financial services is rampant. Because of its association with concepts of wisdom and learning, "sage" seems to be a popular word from which to assemble a name for

use within the financial services market. The FINRA website lists seven FINRA members whose names start with the term "sage." Some (though not all) are broker dealers, and some (though not all) are licensed to do business in Indiana, where Lincoln is based. Seven registered U.S. Trademarks include names including "sage" for use in the financial services industry; a total of 270 trademarks including "sage" are federally registered. Six more have state-registered trademarks. The Business Name section of the CT Corsearch search report discloses twenty business that combine "sage" and "financial." An Internet search discloses twenty websites that combine "sage" and "financial." The SEC's website lists 33 U.S. companies as registered with the SEC and/or the states. Several of those names combine "sage" with other words and are approximately the same length as "SagePoint" with the same number of syllables.

Lincoln minimizes the significance of those other entities because they are not direct competitors — none are listed among the nation's largest broker dealers like Lincoln and SagePoint Financial. The court doesn't share that view. To the extent any of these other "sage"-styled entities provide financial services in a limited region — and several do — they compete with Lincoln and its "Sagemark Consulting" brand in that limited region.

SagePoint Financial also argues that the "Sagemark Consulting" mark is weak because it isn't well known in the financial services industry, noting that Lincoln's website makes minor use of the mark in its own advertising. Research Magazine, a publication considered reliable in industry, said in a February 2009

article — after this controversy arose — that Lincoln Financial is best known for its fee-based financial model, Sagemark Consulting. Apart from that evidence of dubious weight, Lincoln hasn't presented direct evidence that financial advisors or end consumers recognize, or are familiar with, the "Sagemark Consulting" mark. Lincoln hasn't provided any survey evidence or shown how prevalently its mark is used in the relevant market. *See* <u>Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.</u>, 149 F.3d at 728-729. When this suit was filed, SagePoint Financial's CEO didn't know what Sagemark Consulting was and didn't consider Sagemark Consulting to be a competitor.

Lincoln hasn't shown that its mark is strong and entitled to broad protection. <u>Knaack Mfg. Co. v. Rally Accessories, Inc.</u>, 955 F. Supp. 991, 1001-1002 (N.D. Ill. 1997) (holding that general statements by the plaintiff's executives that its mark had been used for 25 years and had spent millions of dollars in advertising was insufficient to show that the mark had gained brand recognition among consumers). This factor weighs against granting an injunction.

6

The record contains little evidence of actual consumer confusion, but Lincoln can't reasonably be expected to tender such evidence at this stage since SagePoint Financial changed its name only weeks ago. *See* <u>Eli Lilly & Co. v. Natural Answers, Inc.</u>, 233 F.3d at 464. Lincoln claims that a business school putting on a financial planning career fair confused Sagemark Consulting for

"Sagemark Financial," and at least one person asked whether Lincoln purchased the AIGFA business from AIG.

Shortly after SagePoint Financial announced its new name, the president of a third-party recruiting firm mentioned to a Lincoln that the new name was similar to Lincoln's mark, and asked if Lincoln were buying AIGFA. That person denies that his questions were related or borne of confusion. During the week of the preliminary injunction hearing, a wholesaler of a third-party money management firm that Sagemark Consulting uses asked a Sagemark Consulting representative whether Lincoln bought AIGFA. Lincoln could be harmed if investment advisors come to believe Lincoln is acquiring the former AIG business because such a perception would harm its efforts to recruit investment advisors who worked for AIGFA, and who now work for SagePoint Financial. Such "recruitment" of a competitor's financial advisors apparently is part of what is done in the parties' business.

SagePoint Financial disputes the significance of this evidence, arguing that evidence of actual confusion must show actual confusion among relevant consumers. *See* <u>Packman v. Chicago Tribune Co.</u>, 267 F.3d at 645. SagePoint Financial says that a personnel recruiter at a career fair isn't a relevant consumer, and there was no indication that the confusion was between "Sagemark Consulting" and "SagePoint Financial." SagePoint Financial points out that Lincoln hasn't submitted survey evidence showing that consumers are likely to be confused in the marketplace. Even though the absence of survey evidence isn't

fatal to a plaintiff's request for a preliminary injunction, Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d at 1086, Lincoln's evidence doesn't appear to be probative to the issue of actual confusion. As such, this element doesn't weigh in favor of issuing an injunction and is neutral.

7

"[I]n the trademark infringement context, 'intent' refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d at 1120. Essentially, "'passing off' means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d at 829 (citing Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 610 (7th Cir. 1986)). While evidence of intent weighs heavily in favor of a finding of likelihood of confusion, the absence of evidence of intent doesn't prevent a finding that confusion is likely. See Promatek Indus., Ltd. v. Equitrac, Corp., 300 F.3d at 812.

Lincoln says intent should be inferred here because the defendant, as a direct competitor, was well aware of the "Sagemark Consulting" mark and could have chosen any number of dissimilar marks to avoid confusion but didn't. Lincoln thus argues that the defendant violated its duty to select a name far enough removed from its mark to avoid confusion. Lincoln hasn't provided direct

evidence that SagePoint Financial actually knew of Sagemark Consulting or that it intended to do anything other than to change its name.

SagePoint Financial notes that Lincoln's own stock dropped in value by about 70 percent from September 1 to February 1, and argues that, had it intended to leech the goodwill of an existing mark, it wouldn't have targeted Lincoln (though SageMark Financial doesn't identify any financial services firm that was much more successful during that stretch). More persuasively, SagePoint Financial presented evidence that it took care and caution in selecting a new name by hiring a name consultant and engaging in a three-month process to select a non-objectionable name.

The news reports on September 15, 2008 that the parent company, AIG, was seeking a $40 billion loan from the Fed constituted negative publicity for AIGFA, and the bad news kept coming. Some financial advisors feared for their lives. A name change was suggested, and proposals were solicited. Monigle Associates Inc. of Denver, Colorado was selected. The name change process lasted three months from start to finish. Monigle started with a list of 500 names. SagePoint wasn't the first name Monigle suggested; AIG or counsel rejected other names. When SagePoint emerged as one of the names under consideration, AIGFA had a search conducted of the largest and most widely read industry periodicals and found no advertisements for Sagemark Consulting.[1] Monigle said SagePoint

---

[1] AIGFA advertised in a variety of print trade publications, online publications, and trade publication websites for financial advisors. AIGFA also engaged in direct

was a clean, safe name, and after additional research by at least two other consultants (including attorneys), AIGFA didn't think SagePoint would cause confusion with any third-party name. A trademark application for "SagePoint" (though not "SagePoint Financial") was submitted. Still, SagePoint Financial received communication on January 7 from Lincoln not to use the name, and SagePoint Financial hadn't completed its implementation of the name by that date. Indeed, SagePoint Financial's building still had AIGFA signage at the time of the preliminary injunction hearing.

AIGFA obtained Financial Industry Regulatory Authority, or FINRA, approval for the name change on December 24, filed the name change in Delaware on December 31, and caused similar filings to be made with the Securities Exchange Commission and in the remaining forty-nine states, Washington D.C., Puerto Rico, and the U.S. Virgin Islands. The total cost of the name change far exceeds $500,000. Financial advisors associated with SagePoint Financial are required to include the name of their broker-dealer in every communication with the public, so they have obtained new stationery and business cards.

This selection process tends to show that SagePoint Financial acted reasonably and without bad faith in adopting its mark. *See* Michael Caruso and Co., Inc. v. Estefan Enters., Inc., 994 F. Supp. 1454, 1462 (S.D. Fla. 1998) (holding that there was no evidence of bad faith where the defendants showed that

mail advertising targeting licensed financial advisors. SagePoint Financial expects to continue those practices.

they consulted legal counsel, researched potential names for prior users, and chose a name that they believed didn't infringe upon anyone's mark, including the plaintiff's). This factor weighs in favor of the defendant.

Based on the foregoing analysis, Lincoln's likelihood of success in establishing a likelihood of confusion, while better than negligible, is not very strong.

C

Lincoln must show that it has no adequate remedy at law and will suffer irreparable harm without the injunction. "An injury is irreparable for purposes of granting preliminary injunctive relief only if it cannot be remedied through a monetary award after trial." E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d 700, 703 (7th Cir. 2005). "To demonstrate irreparable injury, [Lincoln] must show that [it] will suffer harm that cannot be prevented or fully rectified by the final judgment after trial." Anderson v. U.S.F. Logistics (IMC), Inc., 274 F.3d 470, 478 (7th Cir. 2001). "A plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate." E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co., 414 F.3d at 705.

"Dilution of a trademark is 'remarkably difficult to convert into damages.'" Kraft Foods Holdings, Inc. v. Helm, 205 F. Supp. 2d 942, 950 (N.D. Ill. 2002) (citing Hyatt Corp. v. Hyatt Legal Servs., 736 F.2d 1153, 1158 (7th Cir. 1984)). This is because courts find it "impossible to ascertain the precise economic

consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." <u>Abbott Labs. v. Mead Johnson & Co.</u>, 971 F.2d 6, 16 (7th Cir. 1992); *see also* <u>Promatek Indus., Ltd. v. Equitrac Corp.</u>, 300 F.3d at 813 ("It is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss.").

Lincoln says the harm it will suffer should SagePoint Financial continue is irreparable injury to its goodwill and reputation. Lincoln says it faces harm to its business due to unfair competition as well as risks to its good name by virtue of its inability to control the quality of SagePoint Financial's services and from any perceived connection between Lincoln and the negative press attributed to AIG. Assessing damages from loss of goodwill is difficult at best. Lincoln has shown that it will suffer at least some irreparable harm, though that harm is discounted in the next step in the analysis by Lincoln's modest chance of success on the merits of its Lanham Act claim.

D

Deciding whether the balance of harms weighs more heavily in favor of Lincoln or SagePoint Financial involves a sliding scale approach in which "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh toward its side." <u>Ram Prods., Inc. v.</u>

<u>Chauncey</u>, 967 F. Supp. 1071, 1085 (N.D. Ind. 1997); *see also* <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d at 895.

Lincoln hasn't presented evidence to show that it's actually losing business to SagePoint Financial. Lincoln maintains that the balance of hardships weighs in its favor because the potential injury to its goodwill and reputation outweighs any harm SagePoint Financial might suffer in changing its name again. Lincoln believes that granting a preliminary injunction at this early stage wouldn't affect SagePoint Financial's business volume and any harm suffered would be self-inflicted by the choice of a name similar to Lincoln's mark.

SagePoint Financial claims that an injunction would have a "devastating impact" on it. SagePoint Financial estimates that another name change would damage its credibility and reputation and already has spent over $570,000 in the name selection and roll-out process. AIGFA lost more than 300 advisers (who had generated more than $38 million in revenue the previous year) from September 15 to January 15. SagePoint Financial's CEO believes that were SagePoint Financial required to change its name again, the company would lose at least that many, costing SagePoint Financial more than $30 million.

Lincoln doesn't ask that SagePoint Financial be shut down or forced out of business — only that it stop using the "SagePoint Financial" name. Without the injunction, SagePoint Financial might continue to attract consumers that otherwise would purchase services from Lincoln, thereby acquiring goodwill that belongs to Lincoln. On the other hand, the potential harm to SagePoint Financial

— both from the substantial costs of a re-launch campaign and the unmeasurable harm that a failed attempt at a name change would bring to a business already shadowed by its AIG past — favors denying injunctive relief at least to the same extent. *See e.g.,* <u>AM Gen. Corp. v. DaimlerChrysler Corp.</u>, 311 F.3d at 832-834.

At some point the court must address an aspect of the case that it cannot weigh, though only a recluse would know nothing of it. As bad as AIG's news coverage was before the preliminary injunction hearing, it has been exponentially worse since. News broke of AIG paying large sums to present employees as retention bonuses, including some who created the credit default swaps from which the government tried to rescue AIG in the first place. Whatever irreparable harm arose from association with AIG at the time of the hearing probably is much greater now[2] — though the court has no evidence on which to base such an evaluation. Since both sides claim irreparable harm from association (incorrect in Lincoln's case, correct but perhaps escapable for the defendant), the court assumes, for today's purposes, that the increased heat threatens both sides equally. The court mentions the topic only to acknowledge that while it has been quite busy with criminal cases since the hearing, its head hasn't been buried in the sand.

---

[2] Indeed, on the March 28 "Wait Wait . . . Don't Tell Me" show on National Public Radio, the host mused that among the names that would be more popular than AIG for the parent company were "The Botulism Company," "International Body Odor," and "O.J. Simpson."

The balance of harms seeks to evaluate which side would suffer most from error in the preliminary injunction ruling — the harm Lincoln would suffer before it ultimately wins its case without a preliminary injunction against the harm SagePoint Financial would suffer if it is forced to change its name again but ultimately is found not to have infringed Lincoln's mark. AM Gen. Corp. v. DaimlerChrysler Corp., 311 F.3d at 831. The harm caused by an erroneous ruling would fall far more harshly on SagePoint Financial, whose goodwill would be damaged immediately and could not be repaired by ultimate victory in the suit. The corresponding harm to Lincoln is considerably less certain, and its chance of ultimate success appears, at this point, to be modest at best. The balance of harms favors denial of the preliminary injunction.

E

"The final factor to be considered in conjunction with a preliminary injunction is the public interest, which is the effect that granting or denying the injunction will have on nonparties." Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d at 1121. Although injunctions preventing violations of the Lanham Act are in the public interest, *see* Promatek Indus., Ltd. v. Equitrac Corp., 300 F.3d at 813-814; Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d at 1121, Lincoln hasn't shown that the public is familiar with its mark or that consumers need protection from any alleged likelihood of confusion. Injunctive relief in Lanham Act cases generally serves the public interest by

eliminating consumer confusion in the marketplace, but Lincoln hasn't shown a likelihood of confusion. On the other hand, the record doesn't demonstrate that a limited injunction would adversely affect the public interest in this case, rather than simply maintain the status quo. Accordingly, this factor is not of great import in this dispute.

III

For the foregoing reasons, the court concludes that given Lincoln's modest likelihood of success on the merits of claim, the speculative nature of the irreparable harm Lincoln would suffer were a justifiable preliminary injunction denied, and the extensive irreparable harm SagePoint Financial would suffer were a preliminary injunction erroneously entered, the court DENIES Lincoln's motion for preliminary injunction (Doc. No. 6).

SO ORDERED.

ENTERED: April 2, 2009

 /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court